**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**
**NORTHEASTERN DIVISION**

| | | |
|---|---|---|
| STEVEN WAYNE OLINGER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 5:17-cv-02169-JEO |
| | ) | |
| NANCY BERRYHILL, Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION**

Plaintiff Steven Wayne Olinger brings this action pursuant to 42 U.S.C. §

405(g), seeking review of the final decision of the Acting Commissioner of Social

Security ("Commissioner") denying him Supplemental Social Security ("SSI") and

Disability Insurance Benefits ("DIB"). (Doc. 1).[1] The case has been assigned to

the undersigned United States Magistrate Judge pursuant to this court's general

order of reference. The parties have consented to the jurisdiction of this court for

disposition of the matter. *See* 28 U.S.C. § 636(c), FED. R. CIV. P. 73(a). Upon

review of the record and the relevant law, the undersigned finds that the

Commissioner's decision is due to be affirmed.

---

[1]References herein to "Doc(s). __" are to the document numbers assigned by the Clerk of
the Court to the pleadings, motions, and other materials in the court file, as reflected on the
docket sheet in the court's Case Management/Electronic Case Files (CM/ECF) system.

# I. PROCEDURAL HISTORY

Plaintiff filed his applications for SSI and DIB on March 30, 2015, alleging

disability beginning February 23, 2015. They were initially denied by an

administrative law judge ("ALJ"). (R. 7, 10-23).[2] Plaintiff filed a request for

review of the ALJ's decision. In support thereof, he submitted an additional

medical statement from is treating physician, Dr. Michael M. Butler. (*Id*. 29). The

Appeals Council ("AC") denied Plaintiff's request for review, stating that "[w]e

find this evidence does not show a reasonable probability that it [(the additional

evidence)] would change the outcome of the decision." (*Id*. at 1-2).

# II. FACTS

Plaintiff was 33 years old at the time of the ALJ's decision. (*Id*. at 44). He

has a high school education and three years of vocational school training. (*Id*. at

45). He is divorced and has two children – ages six and eleven. He lives alone.

(*Id*. at 45-47). His children occasionally live with him. (*Id*. at 47).

Following Plaintiff's administrative hearing, the ALJ found that he had the

medically determinable severe impairments of non-ischemic dilated

cardiomyopathy, status post implantable cardio defibrillator, and poly substance

---

[2]References herein to "R. __" are to the administrative record found at documents 6-1
through 6-12 in the court's record. The page number references are to the page numbers in the
lower right-hand corner of each page in the record.

use/abuse.  (*Id.* at 12).  He also found that Plaintiff did not have an impairment or combination of impairments that met or equaled the severity of a listed impairment.  (*Id*. at 13).  He further found that Plaintiff had the residual functional capacity ("RFC") to perform sedentary work with limitations.  (*Id*. at 14).  He determined that Plaintiff could not perform his past relevant work but could perform the requirements of representative unskilled occupations such as a table worker, order clerk, and call out operator, which were identified by the vocational expert.  (*Id*. at 21-22).  The ALJ concluded that Plaintiff was not disabled.  (R. 22).

### III.  STANDARD OF REVIEW

The court's review of the Commissioner's decision is narrowly circumscribed.  The function of the court is to determine whether the Commissioner's decision is supported by substantial evidence and whether proper legal standards were applied.  *Richardson v. Perales*, 402 U.S. 389, 390, 91 S. Ct. 1420, 1422 (1971); *Mitchell v. Comm'r Soc. Sec.*, 771 F.3d 780, 782 (11th Cir. 2015; *Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002).  The court must "scrutinize the record as a whole to determine if the decision reached is reasonable and supported by substantial evidence."  *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983).  Substantial evidence is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  *Id.*  It is

"more than a scintilla, but less than a preponderance." *Id.*

The court must uphold factual findings that are supported by substantial evidence. However, it reviews the ALJ's legal conclusions *de novo* because no presumption of validity attaches to the ALJ's determination of the proper legal standards to be applied. *Davis v. Shalala*, 985 F.2d 528, 531 (11th Cir. 1993). If the court finds an error in the ALJ's application of the law, or if the ALJ fails to provide the court with sufficient reasoning for determining that the proper legal analysis has been conducted, it must reverse the ALJ's decision. *See Cornelius v. Sullivan*, 936 F.2d 1143, 1145-46 (11th Cir. 1991). The court must affirm the ALJ's decision if substantial evidence supports it, even if other evidence preponderates against the Commissioner's findings. *See Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004) (quoting *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir.1990)).

## IV. STATUTORY AND REGULATORY FRAMEWORK

To qualify for benefits a claimant must show the inability to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(A). A physical or mental impairment is "an impairment that

results from anatomical, physiological, or psychological abnormalities which are

demonstrable by medically acceptable clinical and laboratory diagnostic

techniques." 42 U.S.C. § 1382c(a)(3)(D).

Determination of disability under the Social Security Act requires a five step

analysis. 20 C.F.R. § 416.920(a)(4). Specifically, the Commissioner must

determine in sequence:

> whether the claimant: (1) is unable to engage in substantial gainful
> activity; (2) has a severe medically determinable physical or mental
> impairment; (3) has such an impairment that meets or equals a Listing
> and meets the duration requirements; (4) can perform his past relevant
> work, in light of his residual functional capacity; and (5) can make an
> adjustment to other work, in light of his residual functional capacity,
> age, education, and work experience.

*Evans v. Comm'r of Soc. Sec*., 551 F. App'x 521, 524 (11th Cir. 2014).3  The

plaintiff bears the burden of proving that he was disabled within the meaning of the

Social Security Act. *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005); *see*

*also* 20 C.F.R. § 404.704. The applicable "regulations place a very heavy burden

on the claimant to demonstrate both a qualifying disability and an inability to

perform past relevant work." *Id*.

---

[3]Unpublished opinions of the Eleventh Circuit Court of Appeals are not considered
binding precedent; however, they may be cited as persuasive authority. 11th Cir. R. 36-2.

# V. DISCUSSION

Plaintiff asserts that the Appeals Council's "ruling that there is no reasonable probability that [the additional evidence] would change the outcome of the ALJ's decision is not supported by substantial evidence." (Doc. 11 at 14). The Commissioner responds that the additional evidence "does not undermine the substantial evidence supporting the ALJ's findings and his conclusion that Plaintiff was not disabled." (Doc. 15 at 5). To properly evaluate this claim, Plaintiff's full history must be examined.

Plaintiff has not worked since February 2015 when he presented to the emergency room with difficulty breathing. The ALJ described his visit to the emergency room and his stay at the hospital as follows:

> He presented to the emergency room with complaints of difficulty breathing. The records describe the claimant having a past history of "broad spectrum of illicit drug use" and as being a "former drug user" but his urine drug screen this visit was positive for opiates, amphetamines, and methamphetamine. He was also smoking at a rate of one pack per day since age 14. He reported no significant medical history and denied nausea, vomiting, overt chest pain, syncope, lightheadedness, or neurological changes. His cardiac enzymes were not revealing. There was no edema, normal respiratory effort, he moved all extremities well, there were no motor or sensory deficits, and he was mentally normal. He made trips outside to smoke while in the hospital. The impression was of acute pulmonary embolism with acute respiratory failure that improved and possible cardiomyopathy secondary to drug use with secondary acute on chronic shortness of breath that improved. Chest x-ray showed marked improvement in

pulmonary edema once started on medications.  Treatment was with anticoagulant therapy with the claimant to bridge from Lovenox to Coumadin.  The claimant was discharged stable without activity restrictions.

(R. 15-16 (citation omitted)).[4]  Plaintiff's next visit to another hospital was

approximately two weeks later in March 2015.  The ALJ stated that Plaintiff

complained

of progressive shortness of breath but denying dizziness, swelling, fatigue, weakness, or neurological symptoms.  He admits after discharge from a different hospital recently he "decided to use a large quantity of methamphetamines" and his chest tightness worsened prompting him to come in for care.  His urine drug screen was positive for amphetamines and Oxycodone.  He reports a history of using "all drugs in the past" except IV drugs.  His chest x-ray was negative for acute cardiopulmonary process and studies showed a small pulmonary embolism that remained stable throughout the stay. The studies showed possible pneumonia, for which antibiotics were started.  The claimant's blood cultures were negative and his white count remained stable.  The echocardiogram found a left ventricular ejection fraction[5] of 15-20% with severe left ventricular systolic

---

[4] The court has chosen to cite to the ALJ's summary for two reasons: (1) it is an accurate factual summary and (2) the parties do not dispute the accuracy of the same.

[5] "Ejection fraction is a measurement of the percentage of blood leaving your heart each time it contracts."  https://www.mayoclinic.org/ejection-fraction/expert-answers/faq-20058286 (last visited February 16, 2019).

The left ventricle is the heart's main pumping chamber that pumps oxygenated blood through the ascending (upward) aorta to the rest of the body, so ejection fraction is usually measured only in the left ventricle (LV). An LV ejection fraction of 55 percent or higher is considered normal. An LV ejection fraction of 50 percent or lower is considered reduced. Experts vary in their opinions about an ejection fraction between 50 and 55 percent, and some would consider this a "borderline" range.

dysfunction, moderate right ventricular dysfunction, and 4- chamber enlargement. Cardiac catheterization showed nonischemic cardiomyopathy and widely patent coronary arteries with note that an ACE inhibitor was started. He was stable with regards to heart failure. The discharge diagnosis was of acute systolic heart failure, stable; right lobe pneumonia, stable; a small pulmonary embolism, stable; and a Herpes zoster, treated with Acyclovir, stable….

(R. 17 (citations omitted)). During that same month, he was seen "at The Heart Center and reported occasional meth use, including using meth once since his recent hospital discharge. He continued to smoke and stated he was interested in returning to work as a plumber…." (*Id*. (citation omitted)). Additional records from the Heart Center

> show that while following appropriate care and not using
> methamphetamine he required no hospitalization related to his
> cardiomyopathy. He went to the hospital in February and March 2016
> but those visits were for pneumonia with his respiratory panel was
> positive for influenza; he was febrile, and his white count was
> elevated. His cardiomyopathy was stable and he denied cardiac
> symptoms and syncope then…. The pneumonia was not diagnosed as
> a residual or complication of congestive heart failure, as the claimant
> alleged in recent testimony. It is also notable his cardiac status has
> been stable at a New York Heart Association (NYHA) Class II level
> while under cardiac care and not using illicit drugs, as shown in the
> April 2016 records…. The NYHA Class III status in March 2015 is at
> the onset of care and when admitting he recently used meth following
> hospital discharge…. The classification in July 2016 is based on the
> June 2016 acute exacerbation when the claimant admitted recent

*Id*.

methamphetamine use again…. It was suspected he had a spasm and thrombus associated with his meth use with the doctor stating the claimant has been counseled extensively in the past and has very poor insight into his disease process…. He was told more than once in 2016 that long-term options include possibly being a candidate for heart transplant or LVAD in the future but this requires cessation of smoking and avoiding drug use … , both of which continue to be habits/use in the 2015-2016 records. He has continued to go outside to smoke frequently even during hospitalizations…. His requests for Dilaudid "raised some flags" for the doctor during the May 2016 hospitalization when the doctor ordered no Ativan or IV pain medications. His heart failure responded to diuretic use and his lungs were clear with the claimant described doing well at discharge, which was after only one day…. Then, in June 2016, the claimant had a non-ST elevation myocardial infarction in the setting of admitted methamphetamine use….

(R. 17-18 (underlying in original and citations omitted)). Approximately one month later, Dr. Butler saw Plaintiff.[6] He reported that Plaintiff continued to struggle with shortness of breath and fatigue. (R. 577 (noting "[h]e just 'runs out of energy.'")). Dr. Butler also confirmed that the recent myocardial infarction likely was due to Plaintiff's methamphetamine use. (R. 578).

The ALJ summarized Plaintiff's heart related treatment as follows:

The Heart Center records show the claimant's cardiomyopathy has been managed conservatively with oral medications and with implantation of a subcutaneous ICD in September 2015. The records document the claimant having no shocks from the ICD other than the six total postoperatively at home on the day of implantation, which

---

[6] It is undisputed that Dr. Butler is a treating source. Accordingly, his opinions are entitled to substantial weight. *See Wiggins v. Schweiker*, 679 F.2d 1387 (11th Cir. 1982); *White v. Barnhart*, 336 F. Supp. 2d 1183, 1189, n.14 (N.D. Ala. Sep. 15, 2004).

were stated of no concern but related to a known phenomenon and expected to resolve…. In May and June 2015, with no drug use and compliance with medication, the claimant's heart failure was fairly well compensated and his left ventricular ejection fraction was improved to 25-30% with the claimant having no evidence of significant volume excess…. In cardiac follow up, the claimant has repeatedly denied symptoms, including chest pain, syncope, heart racing, fatigue, palpitations, orthopnea, paroxysmal nocturnal dyspnea, syncope, presyncope, dizziness, edema, weakness, and shortness of breath…. He reports living alone and being independent with daily activities, not a fall risk, having no active pain, and having no mobility limitations. He mentioned occasional lightheadedness and some fatigue in June 2015, but also reported otherwise of maintaining a good activity level. His diuretic (Aldactone) dose was decreased … and subsequent visits are inconsistent with ongoing complaints. He has repeatedly voiced maintaining a good activity level … ; described exercising 4-5 times a week on farm activities …; being "very active" and staying busy keeping up with his two children….

(R. 17 (citations omitted)).

During the administrative hearing on July 6, 2016, Plaintiff testified. The ALJ fairly and accurately summarized his testimony as follows:

At the hearing, the claimant testified he is 33 years old and has vocational training in precision machining. He has not worked since February 2015. He is divorced and lives alone but his children (ages 11 and 6) are there with him part of the time. "A lot of times" he sees his children daily. He has joint custody of the youngest child and gave custody of the oldest over to his mother when he got sick. He sometimes prepares his own meals and does his own chores but otherwise friends and family do those for him. He continues to smoke 1/2 pack of cigarettes daily. On a good day, he sits outside and watches them play. He was first diagnosed with double pneumonia and later heart failure. He says congestive heart failure has caused

"quite a few trips" to the hospital for pneumonia. He testified he is
not working because he will be a liability. He does not know of any
jobs where if nauseous he can sit down if he needs to. He drives but
denies shopping stating his ex-wife or a friend do[es] that for him. He
lives in a home on five acres but denies any farming. Since he has
been sick, his friends have been doing his yard work. A bad day is
having problems with nausea, dizziness, and fatigue. He can dress
and shower without assistance and wash dishes. Even on a good day,
he has to take breaks. He uses internet about one hour daily on his
cell phone and uses Facebook. His only hobby is lying on the couch.
When asked if he exercises he replied "I don't ever feel like doing
anything more than what I have to do". On a good day, he can walk
one block and stand for one hour. He testified dizziness with nausea
are medication related side effects and occur with bending/stooping.
He adds that chronic nausea and dizziness occur with sitting and he
can only sit for 30 minutes. He has to go to the restroom frequently
because of nausea. He has to lie down several times daily. He has
swelling in his abdomen and chest that makes it hard to breathe. He
testified he had been clean and sober for seven years when he testified
positive for meth in June 2015 and then used on only one other
occasion, which is not consistent with the medical evidence of record.
He says meth use is for self-medicating because, though he
acknowledges it "hurt" his condition, he also says it makes him able
to get up and go play or go fishing with his children. He has now
been "clean" for 32 days.

(R. 15).

The ALJ concluded in his December 6, 2016 Decision that Plaintiff's

"statements concerning the intensity, persistence and limiting effects of [his]

symptoms are not entirely consistent with the medical evidence and other evidence

in the record for the reasons explained in this decision." (*Id.*) He stated, in

pertinent part:

The claimant's recent testimony of nausea, dizziness, and fatigue being chronic problems and the main reason he cannot work are not corroborated by the medical evidence of record. He has repeatedly denied such symptoms when seen for care. The claimant's recent testimony that he was initially hospitalized for seven days in Scottsboro when incorrectly diagnosed with double pneumonia and then went to Huntsville Hospital just 12 hours after discharge is different than what the medical records show.… The claimant's testimony his grandfather and great grandfather died of heart disease at age 57 and 62, respectively, are different than his report of only a grandfather passing in his 70's with heart disease [(R-474)]. As for his great grandfather, that is not reported in the medical evidence and, notably, he added in testimony that individual also had a diagnosis of cancer. The claimant testified after discharge from Huntsville Hospital in March 2015, he did nothing, "it was pushing it" to make it from the couch to the bathroom, and it was "a good month or two" before he could even go from his house to his vehicle to go to the doctor. However, records show he was at his cardiologist two weeks after discharge reporting he is maintaining a good activity level, reported no limitations to mobility or self-care, he was continuing to smoke and use meth, and he even voiced being interested in returning to work as a plumber [(R. 477)]. The claimant testified his implantable defibrillator has gone off seven times, but he failed to disclose a total of six of those were postoperative on the day it was implanted and related to air accumulation. The claimant testified in July 2016 his cardiologist told him he would know by the end of the month what day he could meet with a heart transplant surgeon for consultation. However, this is not documented in the treating cardiologist's records of July and August 2016. Those records show the claimant's recent myocardial infarction was likely due to his methamphetamine use. He denied any shocks from his ICD, there was no CHF on exam, he was very active with his two children, and he denied fatigue, chest pain, heart racing or skipping, leg pain with walking, cough, weight gain, confusion, or trouble breathing at night…. This evidence suggests other statements of the claimant to be suspect.

(R. 17-18 (some citations omitted)).  The ALJ evaluated Plaintiff's counsel's argument that his heart disease was heredity and that his drug use was "totally irrelevant."  (*Id*. at 18).  The ALJ also fully evaluated Plaintiff's activities of daily living (*id*. at 19) and his limitations due to his medical conditions (*id*. at 19-20).

One month after the ALJ's decision, while the case was on appeal to the Appeals Council, Plaintiff's attorney submitted additional evidence -- Dr. Butler's letter -- to the Council for their consideration.  The letter is dated January 5, 2017, and provides as follows:

> To Whom It May Concern:
>
> I have been asked by Mr. Olinger to provide clinical information regarding his cardiomyopathy. Mr. Olinger was diagnosed with a dilated cardiomyopathy back in March of 2015. He has had a left heart catheterization demonstrating normal coronary arteries. He has a history of methamphetamine use and it is suspected that this is the cause of his dilated cardiomyopathy.  He has not had improvement in his LV function despite aggressive medical therapy.  His LV ejection fraction is approximately 15-20%.  He has had a primary prevention ICD placed and he has been compliant over the last six months with his medical therapy and has been drug-free for the last six months. He does have New York Heart Association class II symptoms, but often has class III symptoms and gets short of breath with fairly minimal exertion. I do not foresee these symptoms improving significantly in the future due to his severe dilated cardiomyopathy. Please do not hesitate to call my office with any questions as Mr. Olinger has asked me to send you this letter regarding his cardiomyopathy.

Sincerely,

Michael M. Butler, M.D., F.A.C.C.

(R. 29). Premised on this letter, Plaintiff's counsel now asserts that "[t]here is more than a reasonable possibility that this new evidence should change the ALJ's decision." (Doc. 11 at 14). The Commissioner disagrees, stating that this evidence "does not undermine the substantial evidence supporting the ALJ's findings and his conclusion that Plaintiff was not disabled. (Doc. 15 at 5). The court agrees with the Commissioner.

At the outset, it is noted that the Appeals Council must consider new, material, and chronologically relevant evidence. *See Ingram v. Comm'r Soc. Sec. Admin.*, 496 F.3d 1253, 1261 (11th Cir. 2007). The Appeals Council may remand the matter to the ALJ for further consideration when appropriate. Similarly, this court considers the entire record, including any new evidence submitted to the Appeals Council, to determine whether substantial evidence supports the ALJ's decision. *Id.* at 1266.

In this instance, the court finds that Plaintiff has failed to show that Dr. Butler's letter, when considered with the entire record, warranting a finding that the ALJ's decision was incorrect. Dr. Butler's letter is essentially consistent with the ALJ's finding that Plaintiff's ejection fractions during the relevant period were

14

20-25% and 25-30% when he was complaint with his medical regime. (*See* R. 13, 18, 485-503, 506-21). Additionally, the ALJ noted that Plaintiff's ejection fraction was 15%-20% when Plaintiff was "functioning during acute failure and in conjunction with non-compliance with recommended treatment and substance use/abuse." (R. 13, 18). Much of Dr. Butler's letter is redundant with the medical evidence considered and discussed by the ALJ. For instance, the letter also reiterates Plaintiff's March 2015 diagnosis of cardiomyopathy, his left heart catheterization demonstrating normal coronary arteries, his history of methamphetamine use, and the methamphetamine's "suspected" causation of his dilated cardiomyopathy. (R. 29). Dr. Butler's additional conclusory statement that he did not "foresee" Plaintiff's "symptoms improving significantly in the future due to his severe dilated cardiomyopathy" is not sufficient to undermine the decision of the ALJ. (*Id.*)

To the extent that Plaintiff's counsel states that the letter shows that Plaintiff's "ejection fraction has dropped to 15-20% again, at a time when he is complaint with his medical treatment and is not suing drugs," thus demonstrating that there is a reasonable probability this evidence should change the ALJ's decision, the court disagrees. (Doc. 11 at 14). The ALJ considered the changes in Plaintiff's ejection fraction percentages over an extended period. Additionally, the

record shows that Plaintiff's ejection fraction changed multiple times during the twenty-two months before the letter was written and submitted to the Appeals Council. For example it was 15-20% on March 3, 2015, 20-25% on October 27, 2015, and 20% on June 5, 2016. (R. 577). There is no supporting medical documentation showing that Plaintiff's ejection fraction was 15-20% in January 2017, when the letter was written. Finally, the letter does not state that Plaintiff could not perform work at the sedentary level as determined by the vocational expert and ultimately by the ALJ.

In sum, the court finds that the well-reasoned decision of the ALJ is supported by substantial evidence. Plaintiff's challenge is without merit.

## VI. CONCLUSION

For the reasons set forth above, the undersigned concludes that the decision of the Commissioner is due to be affirmed. An appropriate order will be entered separately.

**DONE,** this the 20th day of February, 2019.

_____
**JOHN E. OTT**
Chief United States Magistrate Judge